**Julie TOTH, Plaintiff,**

v.

**INA LIFE INSURANCE COMPANY OF NEW YORK, et al., Defendants.**

**No. CV 08–653–JE.**

United States District Court, D. Oregon.

July 14, 2009.

Mark D. DeBofsky, Daley, DeBofsky & Bryant, Chicago, IL, Megan E. Glor, Portland, OR, for Plaintiff.

William T. Patton, Sarah E. Haushild, Lane Powell, P.C., Portland, OR, for Defendants.

## OPINION AND ORDER

MOSMAN, District Judge.

On June 18, 2009, Magistrate Judge Jelderks issued Findings and Recommendation ("F & R") (# 38) in the above-captioned case recommending that I GRANT plaintiff's Motion for Summary Judgment (# 19) and DENY defendants' Cross Motion for Summary Judgment (# 28), and that judgment should be entered requiring defendants to restore plaintiff's long term disability payments, pay past due benefits with interest, and pay plaintiff's reasonable attorney fees. No objection to the F & R was filed.

## DISCUSSION

The magistrate judge makes only recommendations to the court, to which any party may file written objections. The court is not bound by the recommendations of the magistrate judge, but retains responsibility for making the final determination. The court is generally required to make a *de novo* determination of those portions of the report or specified findings or recommendation as to which an objection is made. 28 U.S.C. § 636(b)(1)(C). However, the court is not required to review, under a *de novo* or any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the F & R to which no objections are addressed. *See Thomas v. Arn,* 474 U.S. 140, 149, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Reyna–Tapia,* 328 F.3d 1114, 1121 (9th Cir.2003). While the level of scrutiny under which I am required to review the F & R depends on whether or not objections have been filed, in either case, I am free to accept, reject, or modify any of the magistrate judge's F & R. 28 U.S.C. § 636(b)(1)(C).

Upon review, I agree with Judge Jelderks's recommendation, and I ADOPT the F & R(# 38) as my own opinion.

IT IS SO ORDERED.

FINDINGS AND RECOMMENDATION

JOHN JELDERKS, United States Magistrate Judge.

Plaintiff Julie Toth brings this action pursuant to § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132(a)(1)(B), seeking review of a decision by defendants INA Life Insurance Company of New York (INA) and Pfizer, Inc. Long Term Disability Plan (Pfizer) terminating her long term disability benefits. Plaintiff moves for a summary judgment establishing her entitlement to those benefits. In the alternative, she moves for a judgment in her favor pursuant to Fed.R.Civ.P. 52.[1] Defendants move for a summary judgment establishing that their termination of plaintiff's benefits was lawful.

For the reasons set out below, plaintiff's motion for summary judgment should be granted, and defendants' cross motion for summary judgment should be denied.

*Procedural Background of Plaintiff's Claim for Disability Benefits*

Plaintiff formerly worked for defendant Pfizer as a sales representative and manager. She developed chronic fatigue syndrome (CFS), orthostatic hypotension, and neurocardiogenic syncope after sustaining a concussion in a horse riding accident in 1997, and stopped working because of these impairments on May 9, 2000.

While she worked for defendant Pfizer, plaintiff participated in the Pfizer, Inc. Long Term Disability Plan (the Plan), which is an "employee welfare benefit plan" within the definition of 29 U.S.C. § 1002(1). The Plan was underwritten and administered by defendant INA, which is a subsidiary of CIGNA Corporation (CIGNA).

Under the Plan, an employee is defined as disabled, if because of Injury of Sickness,

1.  he or she is unable to perform all the material duties of his or her regular occupation; and

2.  after Monthly Benefits have been payable for 24 months, he or she is unable to perform all the material duties of any occupation for which he or she may reasonably become qualified based on education, training, or experience.

Plaintiff applied for long term disability benefits under the plan on November 7, 2000. Short-term disability benefits were approved and paid for the period of May 10, 2000, through November 8, 2000. However, plaintiff's application for long term benefits was denied on April 18, 2001. Plaintiff appealed the denial of her application for long term disability benefits, and CIGNA upheld the denial on September 27, 2001.

In an action filed in this court on December 20, 2001, plaintiff sought judicial review of CIGNA's denial of her application for disability benefits. *Toth v. Pfizer Long Term Disability Plan,* Cv. No. 01–1845–JE (D.Or. Mar. 3, 2003).

Based upon a *de novo* review of the record before the Plan Administrator, in a Findings and Recommendation dated March 11, 2003, I concluded that plaintiff had been continuously disabled during the benefits waiting period, and that there was

---

**1.** Plaintiff correctly notes that where, as here, it conducts *de novo* review, the court may alternatively conduct a trial on the record, make findings, and enter a judgment pursuant to Fed. R. Civ. 52. *Kearney v. Standard Ins. Co.,* 175 F.3d 1084, 1094–95 (9th Cir.) (1999) (*en banc* ).

no evidence that her condition had subsequently improved enough so that she could work. *Id.* at 8. I recommended that defendants be ordered to pay plaintiff long term disability benefits up to the date of judgment, and that they also be required to pay prejudgment interest and plaintiff's reasonable attorney's fees.

My Findings and Recommendation was adopted by the Honorable Robert E. Jones, and a Judgment was entered in plaintiff's favor on May 20, 2003.

Plaintiff also applied for Social Security disability insurance benefits. In a decision issued on October 3, 2003, an Administrative Law Judge found that plaintiff could not perform her past relevant work, and that her "significant non-exertional limitations" prevented her from performing other work. Accordingly, plaintiff was found to be disabled within the meaning of the Social Security Act, and began receiving disability insurance benefits.

In a letter dated October 13, 2003, CIGNA stated that plaintiff's claim for long term disability payments had been reopened and approved, "with the benefit start date of November 8, 2000." Plaintiff received disability benefit payments without interruption from May 21, 2003, until February 7, 2006.

On February 1, 2006, based upon a review by Maureen Clark, a nurse that it employed, CIGNA notified plaintiff that it was terminating her long term disability benefits. The notice of termination stated that it was "not evident" that plaintiff's condition was sufficiently severe to prevent her "from performing all the material duties of any occupation for which" she "might reasonably become qualified based upon education, training or experience." Plaintiff was informed that she would receive a final check "through February 7, 2006." She was also informed of her right to request review of the decision, and to bring an action pursuant to ERISA if her appeal was denied.

Plaintiff appealed the decision to terminate her disability benefits, and submitted additional medical evidence and the statements of a number of friends and neighbors concerning her symptoms and limitations. On May 9, 2008, CIGNA reaffirmed its decision terminating plaintiff's benefits. Plaintiff brought the present action to obtain review of that decision.

*Medical Evidence*

1. *Medical evidence developed before plaintiff was found to be disabled in earlier proceedings before this court*

As noted above, after this court's earlier decision, CIGNA approved plaintiff's claim for long term disability benefits, and plaintiff received benefits until February, 2006. The question now is whether, after plaintiff's claim for disability benefits was approved, plaintiff provided the Plan Administrator evidence establishing that she continued to be disabled within the meaning of the Plan.

Before turning to the record established after this court found that plaintiff was entitled to disability benefits and plaintiff's application for benefits was approved, I will briefly summarize the medical evidence developed before plaintiff began to receive long term disability benefits. The parties have cited medical records included in the administrative record before October 13, 2003, when CIGNA informed plaintiff that it had approved her application for benefits, and an understanding of that record provides a useful context for the medical evidence that has since been added.

In May, 2000, plaintiff told her treating physician that she was suffering from "extreme fatigue." She also complained of an "inability to perform simple motor functions" and difficulty "think[ing] straight" and comprehending instructions. A few

days later, plaintiff told her doctor that she was "very fatigued and not feeling herself." Her last day of work was May 9, 2000.

Plaintiff was referred to the Oregon Health Sciences University (OHSU), where she was examined by Dr. Bart Duell, an endocrinologist, on May 24, 2000. Dr. Duell has continued to treat plaintiff since that time.

In June, 2000, Dr. M. Colin Jordan, an OHSU specialist in infectious disease, also began treating plaintiff. Dr. Jordan reported that plaintiff "basically qualifies for the chronic fatigue syndrome with its attendant difficulties with mental concentration, extreme fatigue, and a variety of non-specific symptoms." During a visit to Dr. Jordan on July 21, 2000, plaintiff reported that she continued to experience low stamina. She compared her symptoms to being on a roller coaster, noting that she felt weak, shaky, and nauseated during the "down" times.

On August 9, 2000, Dr. Susan Morton examined plaintiff on a referral from Dr. Jordan. Dr. Morton noted that plaintiff continued to suffer from "intense weakness, dizziness and diminished mental clarity," and concluded that plaintiff's symptoms "[m]ay well represent chronic fatigue syndrome."

During a visit to Dr. Jordan on September 29, 2000, plaintiff expressed ongoing concern about her "inability to operate with sufficient energy and stamina to be able to return to work." Dr. Jordan concluded that plaintiff should remain off work for an additional two months, and should then be reevaluated for chronic fatigue syndrome.

In November, 2000, Dr. Duell noted that plaintiff suffered from profound fatigue, decreased stamina, mental confusion, weakness, and nausea, and that she had been disabled by chronic fatigue syndrome since May, 2000. Dr. Duell added that

plaintiff could not work at all on most days, and that, even on her best days, she could work no more than an hour or two.

In late December, 2000, Dr. Duell reported that plaintiff

has been *very* anxious to return to work, but her efforts to resume normal activities have been prevented by severe paroxysmal fatigue and weakness. [Emphasis in original.] Although she has non-specific complaints, she has some type of acquired chronic fatigue syndrome. There are no diagnostic tests that can be done to prove this diagnosis, but she nonetheless has a valid medical illness.

Dr. Duell added that plaintiff was not a suitable candidate for rehabilitation, because previous efforts had failed. He concluded that plaintiff's disability was permanent.

In March, 2001, Dr. Duell reported that plaintiff's physical activities were "limited and non-sustainable," that plaintiff was "unable to do *any* walking on some days" (emphasis in original), and that plaintiff required frequent rest at unpredictable intervals. Dr. Duell stated that plaintiff's endurance was "too unpredictable for her to engage in regular activities, even on a part-time basis." He listed diagnoses that had been ruled out, and stated that plaintiff's illness was physical, not psychiatric.

In May, 2001, plaintiff was tested and examined by Drs. Jeffrey Hirsh and Jack Kron, who were both professors and physicians at OHSU. Tilt table testing results were positive for orthostatic hypotension.

In a letter dated August 2, 2001, Dr. Kron reported that plaintiff's symptoms were consistent with vasovagal syncope, which is also known as neurocardiogenic syncope. Dr. Kron described vasovagal syncope as the occurrence of very low blood pressure caused by an abnormal re-

flex interaction between the heart and the brain, and noted that symptoms may include unusual fatigue, muscle aches, headaches, and mental confusion. Dr. Kron noted that the medical literature described a relationship between chronic fatigue and "neurally mediated hypotension," and stated that plaintiff's "tilt table study was clearly positive, with abrupt drops in both her pulse and her blood pressure, as well as incapacitating weakness and fatigue." He also reported that the symptoms plaintiff described were "consistent with the condition, and her history appeared reasonable and credibly described."

On August 30, 2001, Dr. Kron diagnosed plaintiff with "a variation of chronic fatigue syndrome/neurocardiogenic syncope."

In a letter to a CIGNA case manager dated January 13, 2003, Richard Bryant, M.D., Professor Emeritus in OHSU's division of Infectious Diseases and another of plaintiff's treating physicians, stated that plaintiff suffers from orthostatic hypotension. Dr. Bryant included a copy of plaintiff's tilt table test, which he indicated confirmed the diagnosis. He concluded that plaintiff was "severely disabled and incapacitated by her illness."

In his chart notes from plaintiff's visit on February 13, 2003, Dr. Kron indicated that plaintiff was doing better since she began taking Acebutolol a month earlier. Dr. Kron stated that plaintiff's "aches and pains level and energy are considerably improved," and that plaintiff was "even able to jog up to 2 miles a day when she is feeling good." He noted that plaintiff continued to "have periods of time when she does feel totally washed out, but her overall quality of life is improved to the point that she is considering seeking part-time employment." He also noted that plaintiff continued to "have orthostatic intolerance," and was unable to stand during an art class she was taking.

2. *Record since conclusion of action finding plaintiff entitled to disability benefits*

a. *Information plaintiff submitted to CIGNA*

At CIGNA's request, plaintiff completed a "Disability Questionnaire & Activities of Daily Living" form on November 14, 2003. Plaintiff reported that she cooked 5–10 minutes per day; cleaned 10 minutes per day 4–6 times a week; shopped 30 minutes twice per week; did laundry 4 minutes once per week; did 0–10 minutes of yard work up to 5 times per week; gardened 10 minutes a few times a year; read 0–30 minutes 2–4 days per week; and watched television 0–1 hour per day up to 7 days per week. She reported that she went to dinner with friends occasionally, drew or painted up to 20 minutes per day, and was able to dress herself, but sometimes had to wait until an "episode" had passed before she was able to shower. Plaintiff stated that she was too sick "to do any work at all," because her symptoms were not controlled. She added that she had to be very careful in pacing her activities or she would "kick off an episode," and that she was sometimes "profoundly weak" and could not concentrate. Plaintiff reported that she tried to exercise when she was well, and that she could occasionally exercise 5 times per week for up to 30 minutes at a time. She stated that she was "lucky to feel well enough to go once" a week to a gym to swim or lift weights, and that she was not well enough to do any exercise on some days. Plaintiff reported that she was trying to work at a nonprofit organization that she had started, but that she had been too sick to work at all during the previous month. She also stated that she had tried giving horseback riding lessons, but that this activity had often made her sick "during and/or afterwards." She reported that she had given approximately

10 lessons in 2002, and had "given about 3 or 4" lessons during 2003.

At CIGNA's request, on January 12, 2004, Dr. Duell completed a Physical Abilities Assessment Form setting out his opinion concerning plaintiff's limitations. Dr. Duell indicated that plaintiff's physical abilities were significantly limited in many areas. He noted that plaintiff had an "unpredictable functional state due to paroxysmal neurocardiogenic hypotension and vascular instability," and concluded that, "[a]lthough she is motivated to be active, she is unable to engage in sustained physical exertion." On the portion of the form asking him to indicate the level of physical work most appropriate for plaintiff, ranging from "no work" through "very heavy" work, Dr. Duell checked the block corresponding to "sedentary" work.[2]

In a copy of the same form that he completed on January 24, 2004, Dr. Kron also indicated that plaintiff had significant physical limitations. He stated that plaintiff had "a variant of neurocardiogenic syncope and has frequent episodes of fatigue and near syncope," and that "[t]hose episodes are exacerbated by stress, fatigue, and extremes in situations—hot/cold." He indicated that, in an 8 hour workday, plaintiff could tolerate a "light" level of physical work.[3]

Plaintiff completed another Disability Questionnaire on April 29, 2005. On that form, plaintiff stated that she could not work regularly because she experienced severe symptoms 5 to 25 days per month. Plaintiff reported spending very little time cooking, cleaning, shopping, doing laundry, gardening, and reading, and reported that she watched television 0–1 hour 2 to 6 times per week. She reported going out for meals with friends 2 or 3 times per month, and riding her horse for 15–30 minutes up to four times per week. Plaintiff stated that she showered when she was least symptomatic, and that she could not dress herself every day. She reported walking up to 30 minutes up to 4 times per week, and indicated that she went to a gym to stretch, lift weights, and/or swim 5–30 minutes at a time up to 3 times per month. Plaintiff indicated that she taught one or two riding lessons per week if she felt well enough, and that she owned a horse riding/boarding stable where a trainer gave lessons and rented stalls to her students.

Drs. Kron, Duell, and Bryant continued to treat plaintiff during 2004, 2005, and 2006. Following an examination on June 15, 2006, Dr. Duell reported that plaintiff had "chronic fatigue syndrome, neurocardiogenic syncope, and a postconcussive syndrome resulting from head trauma sustained in March 1997." He noted that plaintiff continued to struggle with "these issues despite ongoing treatment and input from her physicians." Dr. Duell added that none of the numerous medications "and other approaches to therapy over the years have produced the desired effects." He reported that, because of persistent fatigue, decreased mental acuity, poor concentration, and a loss of a sense of well-being, plaintiff never felt "totally well." Dr. Duell also reported that plaintiff did not respond well to changes in position, which could cause dizziness, nausea, weakness, worsening fatigue, and a significant decline in mental acuity. He added that, with "severe spells," plaintiff typically experienced severe nausea and weakness that required her to lie down, after which

---

**2.** As noted below, in June, 2006, Dr. Duell reported that plaintiff could not sustain regular work, and reported in November, 2007, that plaintiff's condition was chronic and permanent.

**3.** As noted below, in 2006, Dr. Kron indicated that plaintiff had regressed, and that she was totally and permanently disabled, and would miss more than four days of work per week.

she experienced symptoms of tachycardia, nausea, and decreased mental acuity. He added that plaintiff's attempts to increase her overall activity had "been associated with general worsening of her condition." He stated that the "insurance company" had cited him in support of its conclusion that plaintiff was no longer disabled. Dr. Duell asserted that this reflected "a misrepresentation" of his impression of plaintiff.

Following an examination conducted on June 20, 2006, Dr. Bryant reported that plaintiff had developed orthostatic intolerance and neurocirculatory syncope following a riding accident in 1997. He stated that head trauma often precedes plaintiff's condition, and noted that plaintiff suffered from lightheadedness, weakness, worsening of episodic nausea and dizziness, and with repetitive lateral motion, experienced increased headache and vertigo. Dr. Bryant added that plaintiff had a diagnosis of "chronic fatigue which is in a sense a misnomer except for the fact that most patients with orthostatic hypotension are fatigued on the basis of their fluid volume deficits." Dr. Bryant stated that plaintiff's condition did not require repeated re-testing, and that clinical testing had documented her "orthostatic intolerance." He added that further documentation was not needed to authenticate plaintiff's "basic underlying disease." He concluded by opining that plaintiff "is a dcourageous [sic] woman with an incapacitating illness that has been misinterpreted by [the] insurance company."

In a letter dated July 10, 2006, Dr. Bryant clarified several issues regarding his June 20, 2006 report concerning plaintiff's diagnosis. Dr. Bryant recounted the results of plaintiff's tilt table test. He stated that plaintiff's "condition has a circulatory component that affects her ability to remain erect for a prolonged period," and concluded that "[t]he variation in the frequency and severity of [plaintiff's] symptoms caused by her orthostatic hypotension and neurocardiac syncope, preclude her from being able to predictably participate in a regular 9 to 5 job."

In his chart notes of an examination conducted on September 7, 2006, Dr. David Guarraia, a cardiologist, noted that a review of laboratory and study tests identified abnormal norepi and tilt table tests, that multiple medication trials had failed to provide relief, and that "clinical examination elicits symptoms of nausea and dizziness."

On September 19, 2006, Dr. Kron completed an "Attending Physician Statement Physical Evaluation Form" for CIGNA. Dr. Kron indicated that plaintiff was significantly limited in her ability to perform a number of physical activities, and opined that she "is not able to work or do physical activity consistently on a full time basis." Dr. Kron stated that plaintiff had regressed over time, had "reached maximum medical improvement," and was "totally and permanently disabled." He opined that plaintiff's impairments would likely cause her to miss more than four days of work per week, stated that plaintiff had been totally and permanently disabled for many years, and concluded that plaintiff could not sustain "even sedentary" level work because of her symptoms.

In a letter to CIGNA dated September 25, 2006, Dr. Bryant stated that, despite her persistent attempts to "return to function," plaintiff had "reached maximal medical improvement," and remained totally and permanently disabled because of symptoms from neurocardiogenic syncope and CFS. Dr. Bryant reported that plaintiff was a "courageous and intelligent person" whose background made it "particularly difficult for her to seek the disability support that she richly deserves." He indicated that tilt table testing had con-

firmed plaintiff's diagnosis, and concluded that "her incapacitation is sustained and unremitting."

In an assessment of plaintiff's residual functional capacity that he completed on November 26, 2007, Dr. Duell stated that plaintiff's condition was "chronic, permanent [and] refractory to treatment," and opined that plaintiff's "odds of remission" were "essentially zero." Dr. Duell stated that plaintiff's "fluctuating symptoms of mental and physical fatigue" had been "severe enough to prevent her from continuing her previously successful high level professional career." He noted that plaintiff had tried many different medications, and characterized the assertions of defendants' reviewing physician that plaintiff embellished her symptoms, and that plaintiff could perform full-time work, as "incorrect." Dr. Duell reported that plaintiff had "good days" and "bad days," and estimated that plaintiff's impairments would probably cause her to miss work 10–14 days per month.

In a residual functional capacity assessment completed on November 7, 2008, Dr. Kron reported that plaintiff suffers from CFS and neurocardiogenic syncope. He stated that plaintiff's impairments were consistent with her symptoms, and opined that she was not "a malingerer."

In addition to this material, plaintiff provided CIGNA letters from several of plaintiff's friends and neighbors describing the changes that they had observed in plaintiff since she became ill. These individuals uniformly described plaintiff as severely impaired, and ascribed to her limitations that would preclude competitive employment.

b. *Medical record generated by experts employed or paid by CIGNA*

In a "Claim Strategy" form completed in January, 2006, William Smith, a claims manager, stated that plaintiff owned and operated a boarding/training stable and provided riding lessons. Smith concluded that there was "insufficient current medical to support on limitations and restrictions which would prevent cx from performing any occupation at the current time." This assessment was based upon a review conducted by Maureen Clark, a "nurse case manager."

Plaintiff appealed the determination that she was no longer disabled and submitted new reports from her treating physicians, medical articles on orthostatic hypotension/postural tachycardia, and additional medical records. After receiving the medical records and assessments from plaintiff's physicians, Vincent Engel, a vocational counselor employed by CIGNA, assessed the transferability of plaintiff's skills to sedentary work. Based upon an assessment performed on February 2, 2007, Engel concluded that, because of "the high wage requirement for the claim," he was unable to identify any "transferable occupations" that were appropriate for plaintiff. He added that

> It should be noted that on review of the claim, claimant was know [sic] to be jogging up to 2 miles. It does appear that if she is able to do this, that she could perform the physical requirements of her occupation. Claim is being returned to CM for further claim management.

CIGNA hired Dr. Dan Gerstenblitt to review plaintiff's file. In an assessment dated February 14, 2007, Dr. Gerstenblitt concluded that, "[d]espite a positive tilt table test (which was never repeated), the claim is still being driven by the self reports and self imposed limitations of the claimant." He opined that, "even with orthostatic hypotension, one still should be able to do a sedentary job." Dr. Gerstenblitt stated that, though persons with CFS "may self-limit their work or social activi-

ties ... there is no objective medical basis for disability." He concluded that "there is no objective medical basis upon which to predicate work restrictions," and opined that plaintiff had been able to perform at least sedentary work from February 7, 2006, to the time of his report.

In a letter dated March 13, 2007, CIGNA upheld its decision to terminate plaintiff's long term disability benefits. After plaintiff again appealed this decision, and submitted additional documentation supporting her claim, Dr. Paul Seiferth, CIGNA's Medical Director, reviewed her medical record. Dr. Seiferth summarized his conclusions in a single paragraph as follows:

> [Claimant with] CFS FIBROMYALGIA. [Attending physicians] assert [claimant] unable to work based upon subjective [complaints]. The [Attending Physicians] do not provide measurable evidence of a functional loss. On appeal, [Attending Physicians] provide opinions of [claimant] disabled but do not offer measurable evidence of functional loss to support restrictions of no work.

On May 9, 2008, CIGNA again upheld its termination of plaintiff's benefits. In its explanation of that decision, CIGNA stated that "Ms. Toth's attending physicians assert that she remains unable to work based upon subjective complaints, but provide no measurable evidence of a functional loss."

### Standard of Review

As noted in my earlier Findings and Recommendation, because the terms of the Plan do not provide for discretion on the part of the plan administrator in determining whether a claimant is disabled, the plan administrator's decision to discontinue plaintiff's receipt of benefits is subject to *de novo* review. In carrying out that review, this court must perform an "independent and thorough inspection" of the plan administrator's decision. *Silver v. Execu-* *tive Car Leasing Long Term Disability Plan,* 466 F.3d 727, 733 (9th Cir.2006). The court is required to exercise its "informed and independent judgment" to determine whether the plan administrator's decision was correct. *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan,* 46 F.3d 938, 943 (9th Cir.1995).

### Discussion

Defendant Pfizer's Group Long Term Disability Plan requires claimants to provide "satisfactory proof of disability" in order to qualify for disability benefits. To meet the definition of "disability," a claimant like plaintiff, who has received disability payments for 24 months, must demonstrate that she is "unable to perform all the material duties of any occupation for which ... she may reasonably become qualified based on education, training or experience."

In October, 2003, more than 24 months after the time for which plaintiff first received disability payments, defendant CIGNA acknowledged that plaintiff was disabled. In the present *de novo* review, the question is whether the Plan Administrator correctly concluded that plaintiff's medical condition had subsequently improved to the point that she could perform the material duties of "any occupation." As noted in my earlier Findings and Recommendation, under the terms of the Plan, disability may be established through the reports of treating physicians. *Toth,* Cv. No. 01–1845–JE, slip op. at 10.

In analyzing whether plaintiff provided satisfactory proof that she was disabled as of the time her benefits were terminated in February, 2006, I have reviewed, *de novo,* the voluminous record on which the Plan Administrator based the termination decision. The record before the Plan Administrator included extensive medical records compiled by several treating physicians over a course of examina-

tion, consultation, evaluation, and treatment covering many years. A review of the record supports only the conclusion that plaintiff is totally disabled, and will in all likelihood remain so, barring the development of some new treatment or a remission that is not now anticipated. The overwhelming evidence in the record supports only the conclusion that plaintiff suffers from conditions that severely limit her physical and mental functional capacity. This evidence comes in the form of medical records and opinions furnished by treating physicians who have substantial expertise in the disorders with which plaintiff has been diagnosed, and have a knowledge of plaintiff's particular physical and mental status developed over many years of examination, consultation, and treatment.

Plaintiff cites extensive and compelling medical evidence, provided by treating physicians that have personally observed and recorded her condition over the course of many years, in support of her assertion that she continues to be unable to perform the material duties of any occupation for which she "may reasonably become qualified based on education, training, or experience." This medical evidence is fully consistent with the information provided by plaintiff's friends and neighbors. In contrast, defendants rely on an unsupportable analysis of the evidence, coupled with unfounded accusations of improper bias and contradiction on the part of plaintiff's physicians, and assertions that plaintiff is exaggerating her impairments. Objectively viewed, the totality of the evidence clearly establishes that plaintiff lacks the physical capacity and concentration needed to sustain competitive employment in any field.

■ Defendants correctly note that the Supreme Court has held that ERISA does not require that plan administrators "accord special deference to the opinions of treating physicians." *Black & Decker Dis-*

*ability Plan v. Nord,* 538 U.S. 822, 831, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). In doing so, however, the Court noted that such deference "may make scant sense when, for example, the relationship between the claimant and the treating physician has been of short duration, or when a specialist engaged by the plan has expertise the treating physician lacks." *Id.* at 832, 123 S.Ct. 1965. This indicates that plan administrators and reviewing courts are to give the opinions of treating physicians and medical experts hired by benefit plans the weight that is appropriate under a claimant's particular circumstances. *See, e.g., Jebian v. Hewlett Packard Co. Employee Benefits Organization Income Protection Plan,* 349 F.3d 1098, 1109 n. 8 (9th Cir.2003) (on *de novo* review, district court evaluating evidence in administrative record may consider whether treating physician has had greater opportunity to know and observe patient than has physician hired by plan administrator) (*citing Black & Decker,* 538 U.S. at 832, 123 S.Ct. 1965).

Here, plaintiff has cited the extensive medical records, reports, and opinions provided by physicians who have treated her and tracked the course of her illness over many years. Defendants rely on the opinions of a retained reviewing physician who has never seen or examined plaintiff, and on a one-paragraph conclusion provided by CIGNA's Medical Director, who reviewed the administrative record and likewise never examined plaintiff. They also rely on records reviews performed by a nurse and a vocational expert who worked for defendant INA, and never examined plaintiff. Under these circumstances, it is appropriate to accord greater weight to the opinions of plaintiff's treating physicians.

The evidence in the medical record before the Plan Administrator establishes that plaintiff suffers from chronic fatigue and neurocardiogenic syncope. The ad-

ministrative record includes uncontradicted evidence that these disorders are related and that these disorders can be precipitated by the kind of head trauma that plaintiff sustained in a horse-riding accident in 1997, and uncontradicted medical evidence that these disorders cause the kind of symptoms of which plaintiff has complained for many years. The diagnosis of neurocardiogenic syncope is supported by objective medical testing. There is substantial evidence that plaintiff's disorders can be disabling, and the medical evidence supports the conclusion that plaintiff's symptoms and impairments have generally worsened over time. There is no evidence that plaintiff experienced the symptoms prior to her riding accident. There is no evidence that plaintiff is a malingerer, that she exaggerates her symptoms, or that her treating physicians have exaggerated her symptoms and impairments in a effort to support her claim for disability insurance benefits.

Defendants assert that the administrative record does not contain satisfactory proof that plaintiff is disabled, and argue that plaintiff has not met her burden of providing satisfactory proof that her impairments prevent her from working.[4] In support of these assertions, defendants argue that plaintiff's treating physicians have provided "contradictory opinions regarding plaintiff's work functionality based solely on plaintiff's subjective reports." They also contend that the disability questionnaires that plaintiff completed in 2003 and 2005, along with "other medical records" confirm that plaintiff "is engaging in activities that plainly contradict her subjective reports." In rejecting the evidence that

plaintiff is disabled, defendants rely on the analysis of their own employees and a hired medical evaluator who reviewed plaintiff's medical records, but did not examine plaintiff.

Defendants' arguments are not persuasive. A careful reading of the disability questionnaires that plaintiff completed in 2003 and 2005 does not support defendants' contention that plaintiff's "self-report of activities is contrary to her self-reports of complete lack of work functionality...." Certainly, as defendants note, plaintiff did report that she cooked, cleaned, shopped, did laundry and yard work, read, watched television, drew and painted, exercised, rode horses, occasionally gave riding lessons, and operated a nonprofit organization. However, as noted above, plaintiff reported that she was able to do most daily activities for only a few minutes per day, that activity could trigger severe symptoms of fatigue and weakness, that she was seldom well enough to exercise in a gym, and that she gave few riding lessons. In the November, 2003 questionnaire, plaintiff reported she was "trying" to work at a nonprofit organization, but that she had been too sick to work at all during the previous month. In the April, 2005 questionnaire, plaintiff reported that she taught a riding lesson or two per week if she felt well enough. Though she indicated that she owned a riding/boarding stable, she noted that the trainer gave lessons there and rented stalls to her students. Nothing in these reports of daily activities, or in the information concerning plaintiff's work for her nonprofit organization or at her stable, is inconsistent with plaintiff's assertion that she could not sus-

---

**4.** Another of defendant's arguments, that plaintiff fails to satisfactorily "support her claim that she continued to be unable to work because of her medical diagnoses," inaccurately characterizes both the question before the court and plaintiff's position. The ques-

tion is not whether plaintiff's "medical diagnoses" prevent plaintiff from working, and plaintiff has made no such claim. The question instead is whether the impairments and symptoms caused by plaintiff's diagnosed disorders prevent plaintiff from working.

tain competitive employment. Instead, plaintiff's description of her very limited activities of daily living and work are wholly consistent with plaintiff's assertion that she could not be gainfully employed.

Defendants assert that plaintiff's treating physicians are highly biased plaintiff-advocates who have parroted plaintiff's "subjective self-reports" and submitted contradictory, unsupported and unobjective reports evaluating plaintiff's ability to work. Defendants correctly note that Dr. Kron and Dr. Duell at one time submitted evaluations indicating that plaintiff could work. However, defendants' assertions that these doctors provided no support for their subsequent opinions that plaintiff could not perform competitive work, and that these doctors were not credible, are not supported by the extensive administrative record. These doctors' earlier indication that plaintiff could work appeared on a "check the box" portion of the evaluation forms. In the narrative portions of those reports, Dr. Kron and Dr. Duell reported levels of impairment that cast significant doubt on the conclusion that plaintiff could work. Dr. Duell noted that plaintiff's physical abilities were significantly limited in a number of areas, and reported that plaintiff had an "unpredictable functional state." Dr. Kron likewise noted significant physical limitations, and reported that plaintiff experienced "frequent episodes of fatigue and near syncope." A careful reading of the record does not support defendants' assertion that these doctors' later, adamantly expressed conclusion that plaintiff is totally disabled are inexplicably inconsistent with their earlier opinions. Instead, it is clear that these doctors, who treated and evaluated plaintiff regularly, found that plaintiff's condition generally worsened over time. In an evaluation completed on September 19, 2006, in which he reported that plaintiff was "totally and permanently disabled," Dr. Kron noted that plaintiff had regressed over time. In

his assessment of November 26, 2007, Dr. Duell noted that various treatments had failed to improve plaintiff's condition, and reported that plaintiff's condition is "chronic, permanent, and refractory to treatment." None of plaintiff's treating physicians indicated that a decline in condition was unusual or unexpected for a patient with plaintiff's diagnosis.

The medical record supports only the conclusion that plaintiff's condition never improved after plaintiff's disability was established in 2003, but instead worsened over time. This is fully consistent with the history of plaintiff's impairment: As noted above, though the injury that plaintiff's treating physicians cite as the likely precipitating event leading to plaintiff's ultimate disability occurred in 1997, plaintiff was able to work until May, 2000.

There is no support for defendants' contention that plaintiff's treating physicians relied solely on plaintiff's "self-reports" and had no "objective" basis for concluding that plaintiff could not work. The treating physicians upon whom plaintiff relies here were experts in plaintiff's disorders, and there is no support in the record for the conclusion that they endorsed a level of impairment that was not confirmed by their regular examinations of plaintiff, or that was inconsistent with plaintiff's documented disorders. In confirming plaintiff's diagnosis, plaintiff's treating doctors cited a tilt test conducted in 2001, and have not suggested that a repeat test is needed to determine that plaintiff continues to suffer from neurocardiogenic syncope and apparently related chronic fatigue. In a note dated June 20, 2006, Dr. Bryant, one of plaintiff's treating physicians, stated that plaintiff's condition did not require repeated retesting, and reported that clinical examinations had revealed objective signs that plaintiff continued to suffer from disabling chronic fatigue syndrome.

Defendants have cited no evidence in the record supporting the conclusion that, under the circumstances presented here, repeated tilt table testing was needed to reaffirm plaintiff's diagnosis. Defendants repeatedly characterize the results of examinations performed by plaintiff's treating physicians as essentially "normal" or "unremarkable." However, the physicians who actually conducted these examinations uniformly report problems with dizziness, impaired mental function, and extreme fatigue, and uniformly describe plaintiff as significantly impaired.

It is apparent from the medical record that plaintiff's treating physicians found that their observations of plaintiff were consistent with plaintiff's description of her symptoms and condition. This is significant, because symptoms of chronic fatigue generally cannot be verified through clinical tests. *See Mitchell v. Eastman Kodak*, 113 F.3d 433, 443 (3d Cir.1997) (impermissible for Plan Administrator to impose requirement for "clinical evidence of etiology," not found in the Plan, on claimant basing disability on chronic fatigue syndrome); *Friedrich v. Intel Corp.*, 181 F.3d 1105, 1112 (9th Cir.1999) (noting that CFS is diagnosed through testing, comparing symptoms to accepted list of symptoms, excluding other disorders, and thoroughly reviewing patient's medical history; recognizing absence of "dipstick" clinical test for chronic fatigue syndrome). Defendants have cited nothing in the Plan requiring that the etiology of a disease like chronic fatigue syndrome be established by clinical testing, and there is no basis for requiring plaintiff here to provide clinical proof that her symptoms are disabling. The administrative record supports only the conclusion that the observations of plaintiff's treating physicians, made in their repeated examinations of plaintiff, were consistent with their description of the severity of plaintiff's limitations. There is simply no basis in the administra-

tive record for concluding that plaintiff's treating physicians could not or did not accurately evaluate plaintiff's condition, and honestly and objectively determine that the symptoms she described were consistent with their own objective observations and with plaintiff's confirmed diagnosis. It is obvious that plaintiff's treating physicians uniformly concluded that plaintiff was not a malingerer, and that they concluded that the symptoms of which she complained were both real and fully consistent with her objectively established diagnosis. There is no basis for finding that, in reaching their conclusions, plaintiff's treating physicians were not objective or were professionally dishonest.

Defendants do not dispute that plaintiff "has CFS or other medical diagnoses," and do "not dispute that, in the past, plaintiff's medical diagnoses may have had the effect of preventing her from working." They contend, however, the record is devoid of medical evidence supporting the conclusion that, as of February, 2006, plaintiff could not perform sedentary or light work. This argument is unpersuasive, given that the assessments of plaintiff's physicians on which defendants base their conclusion that plaintiff can work were made at an earlier time when plaintiff was conclusively found to have been disabled, and on 2006 and 2007 evaluations which describe plaintiff as more severely impaired than she was in 2003.

In the face of the consensus of plaintiff's treating physicians that plaintiff is significantly impaired and permanently disabled, defendants rely on the conclusions of a reviewing nurse, a physician hired to review the record, and its own medical director. Given the substantial medical evidence supporting the conclusion that plaintiff is disabled, this reliance was misplaced. Nurse Maureen Clarke's determination that plaintiff was not disabled was

set out in conclusory terms, and did not provide substantial support for termination of plaintiff's benefits. Reviewing physician Dr. Gerstenblitt simply opined that plaintiff's claim was "driven by the self reports and self imposed limitations of the claimant," and opined that plaintiff should have been able to work because "even with orthostatic hypotension, one still should be able to do a sedentary job." He did not explain why this was so, or provide objective support for his rejection of the unanimous opinion of plaintiff's treating physicians that plaintiff could not work. The analysis of Dr. Seiferth, defendant CIGNA's Medical Director, was even more conclusory. Dr. Seiferth stated that plaintiff's treating physicians concluded that she could not work, based upon plaintiff's complaints, and did not provide "measurable evidence of a functional loss." Given that plaintiff's physicians agreed that plaintiff's impairments were verified by physical examination, and given the absence of evidence in the record that plaintiff's disorders are actually of the sort that are susceptible to "measurable" evaluation of "functional loss," Dr. Seiferth's observations do not cast doubt upon the substantial evidence supporting the conclusion that plaintiff is disabled.

In sum, the administrative record which I have reviewed *de novo* establishes that plaintiff has sustained her burden of demonstrating that she is "disabled" according to the terms of the Plan. Summary judgment should be entered in plaintiff's favor, and a judgment should be entered requiring defendants to restore plaintiff's disability benefits.[5] As with the judgment entered in plaintiff's first action before this court to restore disability benefits in 2003,

interest should be awarded on the past due payments to which plaintiff is entitled.

The judgment restoring plaintiff's disability benefits should also state that plaintiff is entitled to recover the attorney fees she reasonably incurred in this action. Under 29 U.S.C. § 1132(g), this court has discretion to award attorney fees to plaintiff. Absent special circumstances, which are not presented in this action, a prevailing ERISA plaintiff should ordinarily recover attorney fees. *E.g., Smith v. CMTA–IAM Pension Trust,* 746 F.2d 587, 590 (9th Cir.1984). An award of attorney fees is appropriate in this action.

### Conclusion

Plaintiff's motion for summary judgment (# 19) should be **GRANTED,** and defendants' cross motion for summary judgment (# 28) should be **DENIED.** A judgment should be entered requiring defendants to restore plaintiff's long term disability payments, pay past due benefits with interest, and pay plaintiff's reasonable attorney fees.

### Scheduling Order

The above Findings and Recommendation are referred to a United States District Judge for review. Objections, if any, are due July 6, 2009. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

A party may respond to another party's objections within 10 days after service of a copy of the objections. If objections are filed, review of the Findings and Recommendation will go under advisement upon receipt of the response, or the latest date for filing a response.

---

**5.** As noted above, in actions such as this, a court conducting a *de novo* review may alternatively conduct a trial on the record and enter a judgment pursuant to Rule 52. *See*

*Kearney,* 175 F.3d at 1094–95. If this proceeding was construed as a trial on the record, plaintiff would be entitled to judgment in her favor pursuant to Rule 52.

A party may respond to another party's objections within 10 days after service of a copy of the objections. If objections are filed, review of the Findings and Recommendation will go under advisement upon receipt of the response, or the latest date for filing a response.

DATED this 18th day of June, 2009.